Joan A. Nunez, formerly Joan A. Simmers, et al. [1] v. Commissioner. Nunez v. Comm'r
Docket Nos. 303-66, 637-66, 681-66. United States Tax Court
T.C. Memo 1969-216; 1969 Tax Ct. Memo LEXIS 79; 28 T.C.M. (CCH) 1150; T.C.M. (RIA) 69216; October 15, 1969. Filed Michael J. Batal, Jr., for the petitioner in docket No. 303-66. Harold Hestnes, for the petitioner in docket No. 637-66. Edward A. Gordon, for petitioner Helen F. Gordon in docket No. 681-66. Gerald M. Lewis, for petitioner Richard K. Gordon in docket No. 681-66. Robert B. Dugan, for the respondent. RAUM
Memorandum Findings of Fact and Opinion In the consolidated cases here involved the Commissioner determined deficiencies in the income taxes of the petitioners as follows:
Petitioners
Year
Income Tax
Deficiency Addition to Tax
Sec. 6653(b), I.R.C. 1954
Richard C Simmers
1960
$35,831.51
$17,915.76
Joan A. Nunez (formerly 1960
35,831.51
17,915.76
Joan A. Simmers)
Richard K. and Helen
1960
18,412.18
9,206.09
F. Gordon
1962
121.71
After concessions *80 made by the petitioners, [2] the only issues presented for decision are as follows: (1) whether, during 1960, the partnership of petitioners Richard C. Simmers and Richard K. Gordon received under a claim of right $174,000, reportable as gross income; (2) whether the partnership of petitioners Richard C. Simmers and Richard K. Gordon overstated deductions in its 1960 returns for travel, entertainment, and promotion in the amount of $19,950; (3) whether petitioners are liable for the additions to tax for fraud for the taxable year 1960 with respect to their alleged failure to report income and their overstatement of deductions; and (4) whether petitioner Joan A. Nunez, formerly Joan A. Simmers, is jointly liable with Richard C. Simmers 1151 for any amount found due with regard to the 1960 income tax return in the names of Richard C. and Joan A. Simmers, though such return was not signed by petitioner Joan A. Nunez. Findings of Fact Some of the facts are stipulated and are incorporated herein by reference. *81 Petitioners Richard C. Simmers and Joan A. Nunez (formerly Joan A. Simmers) were husband and wife during the taxable year 1960 and they then resided in North Andover, Massachusetts. A joint Federal income tax return for the year 1960 in the names of Richard C. Simmers and Joan A. Simmers was filed with the district director of internal revenue, Boston, Massachusetts, on or before April 15, 1961. Joan A. Simmers did not sign that return. What purported to be her signature was placed on the return by someone else. The petitioners Richard K. Gordon and Helen F. Gordon were husband and wife and resided in Andover, Massachusetts, during the taxable years 1960 and 1962. They filed timely joint income tax returns for the years 1960 and 1962 with the district director of internal revenue, Boston, Massachusetts. Richard C. Simmers filed an amended Federal income tax return for 1960 with the district director of internal revenue, Boston, Massachusetts, on April 8, 1965. Richard K. Gordon filed an amended Federal income tax return for the year 1960 with the district director of internal revenue, Boston, Massachusetts, on April 8, 1965. A partnership return in the names of Richard K. *82 Gordon and Richard C. Simmers for the taxable year 1960 was filed with the district director of internal revenue, Boston, Massachusetts, on or before April 15, 1961. An amended partnership return of Richard C. Simmers and Richard K. Gordon for the year 1960 was filed on or about April 8, 1965. The several petitioners, Richard C. Simmers, Joan A. Nunez, and Richard K. and Helen F. Gordon resided in Massachusetts at the time they filed their respective petitions herein. On October 3, 1958, the Massachusetts Parking Authority ("Parking Authority") was created under the provisions of Chapter 606, Acts of 1958, of the Commonwealth of Massachusetts, for the purpose of financing, constructing, and operating a parking garage under a portion of the Common in Boston, Massachusetts. The Foundation Company of New York City ("The Foundation Company") was awarded the prime construction contract by the Parking Authority. The contract between The Foundation Company and the Parking Authority was executed on March 2, 1960; it provided that The Foundation Company was to receive $7,500,000 for all the work to be performed. During 1960 Richard K. Gordon ("Gordon") was a lawyer in Andover, Massachusetts, *83 a small town approximately 20 miles north of Boston. He practiced alone and did not specialize in any particular area of the law. His reported net income from such practice for the entire year 1960 was $7,252.51. During 1960 Gordon also served as a special justice for the Third District of Essex. As a special justice he was assigned to hear cases whenever the caseload became too heavy for the full-time justices. He received a small salary for his services as a special justice and he was permitted to maintain his private practice while so serving. His income from such services in 1960 was $1,414.45. In 1960 Richard C. Simmers ("Simmers") also had a "law office" in Andover. In his 1960 return he described his occupation as "Real Estate Lawyer." However, that return did not disclose any income, gross or net, from his supposed individual practice of law. However, it did disclose activities on two schedules (Schedule C), "Profit (or Loss) From Business or Profession", attached to the return, in which his "Principal Business Activity" was stated to be "Real Estate Sales." These two schedules reported net losses in the amounts of $21,847.44 and $1,350.99, respectively. In his amended 1960 *84 return his occupation was stated as "R. E. Broker." Gordon and Simmers knew each other for many years prior to 1960. On occasion, they referred to one another cases or matters which they believed the other could better handle as a result of his experience. In such cases they usually split the fee. Whenever the fee was first paid to Gordon, he would deposit it in his trustee account at the Merrimack Valley National Bank in Andover before dividing it with Simmers. Simmers and Gordon from time to time considered forming a law partnership but they never did so and they maintained separate offices throughout 1960. For approximately 15 to 17 years prior to 1960 Simmers was personally acquainted 1152 with one Francis W. Kiernan ("Kiernan"). Kiernan had resided in Andover between the years 1949 and 1958 and in 1960 he resided in New Hampshire. During 1960 Kiernan held himself out as an engineer associated with the engineering firm of Muzzillo and Tizian, the firm of consulting engineers chosen by the Parking Authority to be the construction engineers of the Boston Common Garage. Kiernan personally assumed the responsibility given Muzzillo and Tizian under the contract with the Parking *85 Authority to approve all disbursements of funds by the Parking Authority in connection with the construction of the Garage. George Brady ("Brady") was chairman of the Parking Authority. At some undisclosed time in respect of the awarding of the Garage construction contract, Kiernan, Brady, and others representing The Foundation Company entered into a conspiracy whereby certain of the funds appropriated for the construction of the Garage were to be diverted or paid to Brady as a bribe for his efforts in having the construction contracts awarded to The Foundation Company. Under the plan devised by these persons approximately $150,000 of the payments thus destined for Brady were to be made by The Foundation Company under the guise of payments for legal fees and payments (to a purported subcontractor) for the construction of certain portions of the Garage. At first, a Mr. Broderick ("Broderick") was to serve as the conduit through whom the payment of "legal fees" was to be channeled. Broderick a New Hampshire attorney, was Brady's brother-in-law. At sometime during March or April of 1960, however, it was decided that someone else should perform this function. At this point Kiernan *86 was asked by Brady or William Thompson ("Thompson"), chairman of the board of The Foundation Company, to find someone else to serve as a "go-between" in the payment of the "legal fee" intended by The Foundation Company as a "kick-back" to Brady. Sometime in April of 1960 Kiernan asked Simmers whether he would be interested in "representing" The Foundation Company in some capacity. Simmers, though he was unfamiliar with the Garage project, told Kiernan that he was interested, but that he also wanted Gordon in on the arrangement. Kiernan was agreeable and Gordon was asked by Simmers to participate with him in the matter. Though the record does not convincingly establish whether Kiernan told Simmers and Gordon what there roles would be with respect to the conspiracy described above, Simmers and Gordon accepted Kiernan's offer to recommend them to The Foundation Company. Kiernan then told Thompson that he had the men to replace Broderick as the third party through whom purported "legal fees" and other payments could be transmitted to Brady. On or about April 26, 1960, Kiernan brought Simmers and Gordon to the offices of The Foundation Company in New York to discuss their employment. *87 At that time they met Thompson, Chester Campbell ("Campbell"), president of The Foundation Company, and Gordon Morrison ("Morrison"), its treasurer. In some manner or other Simmers and Gordon were told that they were to act as intermediaries on behalf of The Foundation Company to transmit $150,000 to Kiernan. The record does not establish that they knew that such funds were intended to be paid over ultimately by Kiernan to Brady. They accepted the assignment, and were then given three checks totaling $100,000, in the amounts of $50,000, $35,000, and $15,000, respectively, drawn on the account of The Foundation Company at the Chase Manhattan Bank and payable to the order of Gordon. Each check was signed by Thompson and Morrison. Simmers and Gordon returned to Andover shortly thereafter. Gordon retained possession of the checks given to him by Thompson. On April 28, 1960, Gordon cashed the $15,000 check at the Broadway Savings Bank, Lawrence, Mass., receiving therefor $5,000 in cash and three cashier's checks in the amounts of $5,000, $4,000 and $1,000 respectively. On the same day, April 28, 1960, he cashed the $4,000 cashier's check at his own bank, the Merrimack Valley National *88 Bank, and on May 3, 1960 he cashed the $5,000 cashier's check at the Andover Savings Bank. Sometime before May 9, 1960 Gordon placed $11,000 of the proceeds of the original $15,000 check in his office safe to be paid over to Kiernan as hereinafter set forth together with the proceeds of the $50,000 and $35,000 checks. The $4,000 remaining out of the $15,000 check (consisting of $3,000 in cash and the $1,000 cashier's check referred to above) was split between Gordon and Simmers purportedly as an advance from Kiernan on the amount they were to receive from The Foundation Company for their services. As part of his share Gordon kept the 1153 $1,000 cashier's check which he endorsed to his wife and which he used for the purchase of a rug. It appears that Brady expected to receive only $96,000 out of the $100,000 turned over to Simmers and Gordon by The Foundation Company, and the withholding of $4,000 by them was consistent with such expectation or understanding. Sometime after the April 26, 1960 meeting in New York, Morrison asked Gordon to send The Foundation Company a letter indicating that he had been retained as an attorney - such letter apparently being necessary to document *89 the receipt of funds by Gordon in his role as an "attorney". Thus, on April 29, 1960, Gordon sent the following letter to The Foundation Company: The Foundation Company 39 Broadway New York, New York
Attention, Gordon G. Morrison Dear Mr. Morrison; In confirmation of our conversation of April 28, 1960, I shall be pleased to represent The Foundation Company in the Massachusetts area. This letter will also serve to acknowledge receipt of checks in the amount of one hundred thousand dollars. Very truly yours /s/Richard K. Gordon Richard K. Gordon RKG/h Although this letter indicated that Gordon alone would represent The Foundation Company it was understood among the parties that Gordon and Simmers were both being hired by The Foundation Company in the same capacity. On May 2, 1960, Gordon attempted to cash the $50,000 and $35,000 checks received from The Foundation Company at the Merrimack Valley National Bank in Andover, but was advised by David MacDonald, Jr. ("MacDonald"), Assistant Vice-President of the bank, that the checks could not be cashed until they were forwarded to the Chase Manhattan Bank for collection. Gordon Thereupon deposited the checks (which *90 he had endorsed) in his trustee account at the bank and they were forwarded to the Chase Manhattan Bank for collection. On May 6, 1960, the two checks had cleared and the bank credited $85,000 to Gordon's trustee account. On the morning of May 9, 1960, Gordon, accompanied by Simmers, presented to the Merrimack Valley National Bank for cashing, a check in the amount of $85,000 drawn on Gordon's trustee account. Gordon and Simmers were then informed by MacDonald that this was an "unusual money transaction" which would have to be reported by the bank to the Federal Reserve Bank of Boston. Neither Gordon nor Simmers objected to such reporting of the transaction and it was so reported by the bank. Gordon and Simmers received the $85,000 in the form of five $10,000 Federal Reserve notes and 350 one hundred dollar bills. Later on May 9, 1960, Simmers and Gordon had a luncheon meeting with Kiernan at the Ritz Carlton Hotel in Boston, at which time they handed over to Kiernan $96,000 in cash, consisting of the $85,000 withdrawn from Gordon's trustee account at the Merrimack Valley National Bank and $11,000 of the $15,000 check cashed at the Broadway Savings Bank. Later in the afternoon *91 of May 9, 1960, Kiernan notified Thompson by phone of his receipt of the $96,000. He then went to Brady's office and delivered to him the funds received ($96,000) from Simmers and Gordon. Brady told Kiernan that the proper amount had been received. In order to effect the payment of further amounts to Brady through Simmers and Gordon, they were at some time told by The Foundation Company to prepare and to send to it an invoice in the amount of $40,000, purportedly on behalf of a sham corporation known as Granite State Realty & Construction Company, Inc. ("Granite State") for work purportedly done for The Foundation Company by Granite State in connection with the Garage. Such invoice, showing Gordon's office address as the address of Granite State, was prepared and sent by Simmers and Gordon to The Foundation Company under date of June 1, 1960. Granite State was a corporation formed by Brady, his wife, and Broderick for the sole purpose of concealing the receipt of some of the payments to Brady from The Foundation Company. Granite State had no employees, it did not in fact perform any work in the construction of the Garage, nor did it engage in any other business activities. On June 8, 1960, The *92 Foundation Company issued a check, signed by Morrison and Thompson, payable to Granite State, in the amount of $40,000. Simmers and Gordon were instructed by The Foundation 1154 Company to deliver the proceeds of this check to Kiernan in cash. On June 17, 1960, Simmers and Gordon took the checks to the Merrimack Valley Naional Bank in Andover where they opened an account in the name of Granite State, naming themselves, respectively, as president and treasurer of the corporation, though neither was an officer of Granite State. The $40,000 check was endorsed by Gordon as treasurer of Granite State and deposited to the account just opened in the corporate name. At about the same time Simmers and Gordon received the $40,000 check described above they were personally in need of funds to acquire and operate a restaurant located in Andover known as "The Red Schoolhouse". In order to raise the funds, they asked Kiernan to "lend" them each $10,000 (for a total of $20,000) of the $40,000 Kiernan was to receive from the proceeds of the Granite State check. Kiernan agreed to do so, apparently with the consent of Brady and The Foundation Company. On June 28, 1960, Simmers drew a check *93 on the Granite State account for $18,000 payable to himself. This amount was intended by Simmers and Gordon to be part of the purported $20,000 "loan" from Kiernan. On July 22, 1960, two checks, each in the amount of $700, payable to Simmers and Gordon, respectively, were drawn on the Granite State account and cashed by them. These amounts were also intended to be part of the purported $20,000 "loan" from Kiernan. No further amounts were withdrawn by Simmers and Gordon from the Granite State account in respect of the $20,000 "loan", though the total amount thus withdrawn by them was only $19,400. No explanation was offered at the trial herein concerning the reason why the principal of the "loan" was withdrawn at different times and in the amounts noted above. Cash payments were made to Kiernan at various times from the Granite State account as Kiernan directed. These payments followed withdrawals from the account as shown here: Date of Check
Payee
Amount
June 24, 1960
Richard K. Gordon
$2,500
July 5, 1960
Cash
8,000
July 5, 1960
Richard C.Simmers
5,000
July 5, 1960
Richard K. Gordon
5,000 No receipts were given by Kiernan in respect *94 of these amounts. On December 22, 1960, a check in the amount of $78.08 was drawn by Gordon payable to The Schoolhouse, Inc., to pay an account of Kiernan's at the restaurant. The cash funds received by Kiernan were given to Brady. During July or August of 1960 Kiernan purchased a one-third interest in "The Red Schoolhouse" by paying $9,700 in cash to the corporation in return for one-third of its stock. The source of the funds used by Kiernan for this purpose was not disclosed at the trial herein. Sometime during October of 1960 Thompson asked Simmers and Gordon to submit to The Foundation Company a statement for legal services in the amount of $100,000. Accordingly, a statement from Simmers and Gordon dated October 24, 1960, was delivered to The Foundation Company for legal services in the amount of $100,000. Simmers and Gordon were sent a letter from The Foundation Company also dated October 24, 1960, acknowledging that it owed Gordon and Simmers $100,000. This letter read as follows: Gentlemen: This is to certify that The Foundation Company, 39 Broadway, New York City, New York owes your firm for legal services pertaining to various operations in the New England area *95 the sum of $100,000.00, $30,000.00 payable herewith and the balance we hereby agree should be paid as follows: Ten payments, starting December 1, 1960, $4,000.00 per month in equal monthly installments for ten consecutive months for a total of $40,000.00, and The balance of $30,000.00 to be paid when the retained percentage of 15% payable from a certain contract with the Massachusetts Parking Authority has been paid. WITNESS the hand and seal of the Corporation this 24th day of October, 1960. The Foundation Company S/R. M. Johnsen ATTEST: S/Joan M. Leonard Asst. Secretary A check in the amount of $30,000 from The Foundation Company payable to Simmers and Gordon, signed by Morrison and Thompson, accompanied the letter of October 24. This check was deposited to a "partnership" account of Simmers and Gordon 1155 on October 28, 1960 in the Merrimack Valley National Bank. This "partnership" account was not opened by Simmers and Gordon prior to October 1960. There was in fact no partnership between Simmers and Gordon for the practice of law. Each maintained his own office in Andover from which each conducted his own legal or business affairs, Gordon at 3 Main Street, *96 and Simmers at 96 1/2 Main Street. The term "partnership" as used herein refers only to the arrangement or joint venture between them relating to The Foundation Company, and particularly to their participation in the conspiracy as intermediaries to provide a cloak for the transmission of funds from The Foundation Company to Brady. While they may have performed some "legal" services for The Foundation Company, such services do not appear to have been of much consequence. On October 27, 1960, Simmers and Gordon borrowed $36,000 from the Merrimack Valley National Bank and deposited that amount in their "partnership" account. The loan was secured by the October 24, 1960 letter agreement of The Foundation Company which acknowledged its obligation to pay Simmers and Gordon $100,000 for legal services. The funds were used for personal purposes as well as expenses incurred in the operation of "The Red Schoolhouse." On October 31, 1960, Simmers drew a check on the Simmers and Gordon "partnership" account in the amount of $30,000. He then presented the check to the bank and received $30,000 in cash. This amount was given to Kiernan. $20,000 of this amount was purportedly in repayment of *97 the two "loans" of $10,000 each made to Simmers and Gordon from the funds which were withdrawn from the Granite State account, described above. On the same date Simmers and Gordon gave Kiernan a check for $11,800, drawn on the "partnership" account. $4,000 of this check was purportedly a repayment of the "advance" given them out of the $100,000 received on April 26, 1960. The remaining $7,800 ($11,800 less $4,000) was supposedly compensation to Kiernan for engineering services allegedly performed in connection with the Indian Ridge Country Club in Andover, a club with which Simmers and Gordon became involved when its original developers encountered financial difficulties. Notwithstanding some general testimony in this connection, the precise nature and extent of the services purportedly performed by Kiernan with respect to this club was not disclosed at the trial herein. Nor does the record satisfactorily reveal the precise nature of the interest held by Simmers and Gordon in the club. On December 1, 1960, Simmers and Gordon received a $4,000 check from The Foundation Company. This purported to be the first of the ten $4,000 installments of the fee for "legal services" described *98 in The Foundation Company's agreement of October 24, 1960. This check was deposited in the Simmers and Gordon "partnership" account on December 5, 1960. No other payments were made to petitioners under this agreement during 1960. They received the nine remaining installments of $4,000 each in 1961, as well as a payment of $25,000 in 1961 through Granite State, described below, which they treated as part of the $100,000 referred to in the letter of October 24, 1960 as an obligation for "legal services." Simmers and Gordon received from The Foundation Company, in January of 1961, a copy of a U.S. Information Return, Form 1099, purporting to show that $34,000 had been paid in 1960 to "Messrs. R. K. Gordon and R. C. Simmers, Attorneys-at-Law, 96 Main Street, Andover, Massachusetts," by The Foundation Company, 39 Broadway, New York, Employer Identification No. 13-5083360. Also, in January of 1961, Gordon received a copy of another Form 1099 from The Foundation Company reflecting the payment by it of $100,000 to "Richard K. Gordon, Main Street, Andover, Mass." These forms related to Simmers' and Gordon's receipt of $34,000 pursuant to The Foundation Company's letter of October 24, 1960 and *99 the $100,000 received from The Foundation Company in April, 1960. On or before April 15, 1961, Simmers and Gordon filed a partnership return with the district director of internal revenue at Boston. The return was filed in the name of "Simmers & Gordon Attys at Law" with an address at 96 1/2 Main Street, Andover, Mass. It reported gross receipts in the amount of $144,000. This amount was intended to reflect their receipt of $134,000 during 1960 from The Foundation Company in the form of the three checks totaling $100,000 received in April, 1960, the $30,000 check received in October, 1960, and the $4,000 check received in December, 1960. The $10,000 difference between the $144,000 reported as income in the return and the $134,000 intended to be reflected as income from "legal fees" by the petitioner is 1156 attributable to a mistake in addition made by petitioners. The Government concedes that such mistake accounts for this difference. Deductions were claimed on this return in the amounts of $32,800 for "salaries and wages" and $19,950 for "Travel, entertainment, promotional, etc." The partnership income as reported in this return was allocated between Simmers and Gordon on a *100 60-40 percent basis, respectively, and these petitioners reported their individual incomes accordingly. The true allocation of any profits derived by Simmers and Gordon from this venture was on a 50-50 basis. The 60-40 allocation was wholly fictitious, the net effect being roughly to equalize the tax burden between them in respect of the income reportable from the venture since Gordon would otherwise have been in a higher tax bracket than Simmers by reason of his other income. Since petitioners included in income all the money received by them purportedly as "legal fees" ($134,000), though they did not retain this full amount, their respective tax burdens were increased accordingly. Thus, to enable them to pay their taxes The Foundation Company gave them $25,000 sometime in 1961. In order to disguise this payment to them The Foundation Company drew a check to Granite State in this amount and sent it to Gordon. This amount corresponded to an item in the amount of $25,000 shown in an invoice from Granite State dated August 1, 1960 for certain fictitious construction work. Gordon deposited the check in the Granite State account and then drew a check to himself on that account, in the *101 amount of $25,000. He then deposited the latter $25,000 check in his personal account. At some later time the amount was split with Simmers. Simmers and Gordon considered this $25,000 to be part of the $100,000 promised them by The Foundation Company for their services. Sometime during late 1961 newspaper reports began to implicate Simmers, Gordon, and others with the diversion of funds from the construction of the Garage. During November of 1961 a representative or representatives of the Internal Revenue Service met with Simmers and Gordon with respect to their 1960 income tax returns. At that time and at later times Simmers and Gordon stated that their April 26, 1960 receipt of $100,000 was a legal fee from The Foundation Company. They also explained to the revenue agents that the $40,000 deposited in the Granite State account and not reported as income had been held at the direction of Morrison, but that these funds had nonetheless been used for personal purposes. In April, 1962, Simmers and Gordon again appeared before agents of the Internal Revenue Service and gave statements under oath which indicated that the amounts received from The Foundation Company were not passed *102 on to others as part of the scheme to embezzle money from the parking Garage. At the time of these interviews Simmers and Gordon were receiving telephone threats from persons unknown to them who warned them not to reveal anything concerning the Garage contract. Some of these threats were reported to the Andover police. Simmers and Gordon both expressed an interest in obtaining gun permits in Andover for personal protection. As a result of their roles in the transactions involved here, as well as other transactions relating to the parking Garage not here in issue, Brady, Kiernan, Simmers, and Gordon were indicted in May 1962 by the Commonwealth of Massachusetts for larceny and conspiracy to commit larceny of the funds of the Massachusetts Parking Authority. The charges against Brady were severed, and Kiernan, Simmers and Gordon were found guilty as charged following a trial in the Suffolk County Superior Court, in April 1963. They thereafter served prison sentences. Brady was not tried; he disappeared from Massachusetts and has been missing for some six or seven years. Morrison and Campbell died during the fall of 1960. In April 1965, while in prison, Simmers and Gordon filed amended *103 partnership and individual tax returns. On the amended partnership return, petitioners reported gross receipts of $134,000 and claimed a deduction of $100,000 for "salaries and wages" and $19,950 for "Travel, Entertainment, Promotional." The petitioners now claim that the partnership income should be redetermined on the basis of a 50-50 allocation between them. The Commissioner determined that Simmers and Gordon understated partnership income by $30,000 by failing to report as income the $40,000 [3] received from The 1157 Foundation Company through the Granite State bank account. The Commissioner further disallowed petitioners' claimed deductions of $32,800 and $19,950. The petitioners now concede that the $32,800 deduction for wages was a fictitious claim. They continue, however, to claim a deduction of $19,950. The Commissioner also determined an addition to tax for fraud under section 6653(b), I.R.C. 1954. Gordon now seeks a refund *104 on account of his alleged overpayment of taxes for 1960. Joan A. Nunez The joint return filed for the year 1960, bearing the names of Richard C. Simmers and Joan A. Simmers (now Joan A. Nunez) was not signed by petitioner Nunez, nor did she authorize anyone to sign that return on her behalf. Also, none of the income reported in the 1960 return was hers. Petitioner Nunez did, however, file a joint return with her husband for the taxable years 1957, 1958, 1959 and 1961 and she often signed such returns without first examining them. She had no knowledge of any of the income reported or of the business income of her husband reflected on the 1960 return. Petitioner Nunez executed forms 872 on February 19, 1964, October 29, 1964, and September 8, 1965, consenting to the extension of time for assessing the joint tax liability for the taxable year 1960. Opinion RAUM, Judge: 1. During 1960 Simmers and Gordon received from The Foundation Company checks in the total amount of $174,000. Of this amount $134,000 was in the form of checks payable directly to one or both of them and $40,000 was in the form of a check payable to Granite State Realty & Construction Company, Inc. This latter *105 check was deposited in a bank account opened in the corporate name by Simmers and Gordon and substantially all of the funds were withdrawn by them shortly thereafter. At issue is whether the entire $174,000 received by petitioners' "partnership" is chargeable to them as income, or whether only $34,000 of this amount may be attributed to them. The resolution of this issue turns on whether Simmers and Gordon received the funds given them by The Foundation Company under a "claim of right", as contended by the Commissioner, or whether, as contended by the petitioner, they received $140,000 from The foundation Company as mere conduits in a conspiracy to pay "kickbacks" for the awarding of the Garage construction contract. North American Oil Consolidated v. Burnet, 286 U.S. 417, 424; Lashells' Estate v. Commissioner, 208 F. 2d 430, 435 (C.A. 6); Atzingen-Whitehouse Dairy, Inc., 36 T.C. 173. In order to understand the petitioners' position herein we classify the payments received by them during 1960 as follows: (1) the April payment of $100,000; (2) the $40,000 received in June in the name of Granite State; and (3) the $34,000 received in the fall *106 under the terms of an agreement to pay them what purported to be legal fees. Petitioners are claiming that the $100,000 and $40,000 payments passed through them, as conduits, into the hands of Kiernan in accordance with the instructions of The Foundation Company. Petitioners submit that only the $34,000 received in the fall was intended as a payment to them for their services. Thus, under the petitioners' theory, only $34,000 of the $174,000 received by them should be treated as income of the partnership. Though the matter is not entirely free from doubt, we agree with the petitioners. It is clear to us that Simmers and Gordon were hired by The Foundation Company to act simply as "go-betweens" in their plan to conceal the payment of "kick-backs" to Brady and possibly to others through him. This role was originally assigned to Broderick, Brady's brother-in-law, and Simmers and Gordon came into the picture only after it was decided that it would be better not to have Broderick participate in respect of the funds involved herein. In hiring Simmers and Gordon The Foundation Company was concerned not with their legal abilities but rather was concerned with their apparent willingness to *107 act as straw men through whom so-called "legal fees" and other payments could be funneled to Kiernan, Brady and possibly others. Though they were perhaps not fully aware of the parts they would play in this scheme, we are satisfied that Simmers and Gordon nonetheless faithfully paid over to Kiernan the amounts given them for that purpose in their roles as "attorneys" for The Foundation Company. Further indication of the purposes for which Simmers and Gordon were given funds by The Foundation Company stems from the implausibility of the view that they were being paid the sums given them as payment for their legal services to that 1158 corporation. Both Simmers and Gordon were small-town lawyers prior to their introduction to The Foundation Company by Kiernan and neither had any experience dealing with legal matters of the nature and magnitude of those involved in the construction of a $7,500,000 parking garage. In fact, prior to this time, Simmers' professional activities hardly seem to have constituted the practice of law at all; rather they appear to have consisted primarily of the conduct of a small-town real estate brokerage business plus possibly some insurance business. *108 Only Gordon appears to have had a bona fide law practice, but this was a small-town practice and he had never received a legal fee even approaching the amounts here involved. We are satisfied that they did not in fact perform any legal services of significance for The Foundation Company and that they were not being paid to do so. We further do not believe that the petitioners were being paid all the funds here involved as a "kick-back" to themselves for any influence in connection with the construction contract awarded to The Foundation Company. It seems clear to us that Simmers and Gordon had no part in the events precipitating the payment of "kickbacks" by The Foundation Company for the awarding of the construction contract. Simmers and Gordon were introduced into the scheme after the construction contracts had been awarded and after the intended payee or payees of bribes were agreed upon by the conspirators. They accordingly had no claim against the diverted funds other than that determined by Brady, Kiernan, and The Foundation Company. We think that at most the only amount paid them during 1960 for their efforts was $34,000. Indeed, we have some doubts as to the $34,000, but *109 petitioners do not challenge the taxability of the entire amount thereof to themselves, and we do not consider it further. To be sure, many of the events involved in this case are confusing [4] or unexplained, such as the reasons why petitioners received payments through a series of checks drawn to themselves and Granite State rather than all at once. It was unclear why payments to Kiernan from the Granite State account (of the $40,000) were made at different times and in various amounts. To the extent that evidence was presented in this connection it was far from fully satisfying and we were left with many residual doubts. Likewise, the evidence concerning the "loans" made by Kiernan to Simmers and Gordon was unsatisfying. However, rather than indicating that all the funds given petitioners were kept by them, these events further tend to persuade us that petitioners were participants in an involved conspiracy designed to conceal the passage of funds through them to Kiernan. *110 We are also cognizant of the fact that the story given by the petitioners at the hearing herein was contrary to that given by them at earlier interviews with internal revenue agents. This may be explained in part by the fact that the petitioners were receiving threats at the time of their discussions with the Internal Revenue Service which caused them to fear the consequences of any implication of others in a scheme to defraud the Parking Authority. In addition, since these discussions with the revenue agents took place prior to the initiation of criminal proceedings against petitioners, but after charges of scandal in connection with the garage were being publicly aired, they were no doubt trying to avoid giving information which might have led to their prosecution, or which might have been used 1159 against them in connection with a future indictment by the Commonwealth. We are inclined to believe their present testimony that they lied to the agents of the Internal Revenue Service. We conclude that $140,000 of the money received by Simmers and Gordon in 1960 was passed on to Kiernan in accordance with instructions from The Foundation Company, and that it did not represent *111 income to them. 2. On their original return, petitioners claimed a deduction of $32,800 for salaries and wages paid, and a deduction of $19,950 labeled "Travel, entertainment, promotional, etc." Petitioners now concede that this $32,800 figure was fictitious. They continue, however, to claim a deduction of $19,950. Though not explained in their returns, this figure is said to represent: (a) $10,000 advanced to Kiernan in October 1960; (b) $7,800 paid to Kiernan for engineering services; and (c) $2,150 for travel expenses. We do not believe that deductions for any of these amounts have been justified here. (a) Petitioner argues that $10,000 of the $30,000 in cash given Kiernan in October, 1960, is deductible because it was paid Kiernan in the hope that Kiernan would give them a receipt to the effect that $150,000 had been passed to him on behalf of The Foundation Company. This receipt, they argue, was believed necessary by them to justify their exclusion of the $140,000 passed on by them from their income tax returns for 1960. Since it is petitioners' position that this $10,000 came out of their own funds and not funds given them to be passed on to Kiernan, petitioners cannot justify *112 their deduction of this amount under the "conduit" theory. They argue instead that this amount is deductible as an ordinary and necessary expense of the partnership, under section 162, I.R.C. 1954, because it was paid to protect their business or its reputation. This argument has no basis in fact. There is nothing here to suggest that the payment of this amount was in any way related to their "reputation," cf. Charles A. Clark, 19 T.C. 48, 52; G. A. Comeaux, 10 T.C. 201, affirmed 176 F. 2d 394 (C.A. 10), nor do we believe that the payment was made under duress. In any case, we do not believe that the petitioners expected that Kiernan would be any more likely to give them a receipt for $150,000 upon the payment of this amount than he was in respect of the payment of the previous $140,000. We are not convinced by the evidence that this $10,000 item qualifies for deduction under section 162. (b) As to the payment of $7,800 to Kiernan for engineering services performed on behalf of the Indian Ridge Country Club, there is too little in the record to indicate the nature or extent of the services allegedly performed. Furthermore, *113 the testimony concerning petitioners' interest in this club did not sufficiently indicate that they and not another were entitled to a deduction for these expenditures. Thus, if they were merely stockholders of a corporation that owned the "club", payments of its expenses by them would probably have to be treated as capital items and not expenses deductible by them. The petitioners simply failed to carry the burden of proof in this regard. (c) Finally, $2,150 was claimed as a deduction for travel and entertainment expenses. Nothing other than the petitioners' unsupported and unconvincing testimony was presented to justify this deduction. We regard such evidence as wholly inadequate. 3. The Commissioner has sought to impose an addition to petitioners' taxes for fraud under section 6653(b), I.R.C. 1954. Although we are satisfied that fraud has not been established in respect of the $19,950 deduction, we are convinced that the $32,800 deduction was false as well as the 60-40 division of "partnership" profits. Nevertheless, in view of our conclusion that petitioners were merely conduits in respect of the $140,000 funds placed in their hands by The Foundation *114 Company, no deficiency or underpayment results in the case of either petitioner, and there is therefore no base upon which to determine any addition for fraud under section 6653(b). 4. Whether Joan A. Nunez (formerly Joan A. Simmers) filed a joint return with Richard C. Simmers for the taxable year 1960 is of no importance in light of our finding that there is no deficiency or addition to tax due for that year. Decisions will be entered under Rule 50. 1160 Footnotes
1. Cases of the following petitioners are consolidated herewith: Richard C. Simmers, docket No. 637-66; and Richard K. Gordon and Helen F. Gordon, docket No. 681-66.↩
2. In addition, petitioners Gordon presented no evidence regarding certain issues raised by them in their petition and they are therefore deemed to have been abandoned.↩
3. Only $30,000 of this amount is reflected in the deficiencies herein as the Commissioner concedes that the petitioners reported as income an additional $10,000 as a result of a mathematical error in their return.↩
4. For example, it is puzzling on this record as to what basis existed for the Commonwealth's larceny and conspiracy to commit larceny charges. This, however, is cleared up in the rather extensive summary of the Supreme Court of Massachusetts in Commonwealth v. Kiernan, 348 Mass. 29, 201 N.E. 2d 504, where the convictions were affirmed. While we have not been able to make any specific findings of fact here on the basis of what appears in that opinion, we may nevertheless take judicial notice of it generally to the same extent that we may refer to any reported opinion of a court of record. It appears from that opinion that the larceny charged consisted of payments (in the aggregate amount of some $400,000) from funds belonging to the Parking Authority to The Foundation Company which had been procured in part at least through the filing of false certifications by Kiernan to the effect that certain work had been performed which had not in fact been performed, followed by the transmission of such payments by The Foundation Company (under the cloak of legal fees and other means of camouflage) through intermediaries to Brady. The participation by Simmers and Gordon, however, was limited to the amounts involved in the present case relating to fictitious legal fees and the false Granite State invoices. Although Kiernan does not appear to have profited from these particular diversions, it appears that he too had received other large sums which had been illegally diverted from the Parking Authority, and in respect of which he had been indicted and convicted along with another participant, one of the members of the Parking Authority. See Commonwealth v. Monahan, 349 Mass. 139, 207 N.E. 2d 29↩.